**Ernie H. WOLDER, doing business as Wolder Salvage Co., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 83–0015.**

United States District Court, D. Hawaii.

July 23, 1985.

Michael W. Atkin, Los Angeles, Cal., A. Bernard Bays and William Meheula, Honolulu, Hawaii, for plaintiff.

Philip A. Berns, Atty. in Charge, West Coast Office, Torts Branch, Civil Div., U.S. Dept. of Justice, San Francisco, Cal., for defendant.

## ORDER

PENCE, District Judge.

Plaintiff, Ernie H. Wolder, doing business as Wolder Salvage Co. (Wolder), brought this action against the United States claiming that when the United States Navy personnel pulled the M/V SLIDRE off the reef in front of Gab Gab Beach in Apra Harbor in Guam, towed her some six miles out to sea and sank her, acting under orders and authority of the Corps of Engineers of the United States Army (Corps), he had been damaged to the extent of $1,100,000 from the loss of his ship. The case was tried on March 19–22, 26–28, 1985. This court heard the testimony, observed the witnesses, reviewed the exhibits and depositions, and listened to arguments of counsel to determine the liability, if any, of the United States to Wolder.

FINDINGS OF FACT

1. On May 21, 1976, the super typhoon PAMELA passed over Guam. PAMELA had winds which exceeded 125 knots. The sea rose 10 to 20 feet above normal, and waves were from 5 to 10 feet high within Apra Harbor. The M/V SLIDRE and the vessels MARIA I and PEACE OCEAN were anchored in the Harbor. The typhoon put all three vessels up on a coral reef that extends from Gab Gab Beach and along Orote Peninsula almost to the entrance of the Harbor.

2. At the time of the typhoon, neither the MARIA I or the PEACE OCEAN was manned. The M/V SLIDRE was manned, but the typhoon nevertheless stranded her on the reef approximately 40 feet from a sharp underwater slope which descended towards the channel. The vessel was located approximately 1100 yards from the center of the navigable channel utilized by deep draft vessels. Both the MARIA I and PEACE OCEAN were subsequently removed from the area by the United States and sunk.

3. During the entire time of the events involving the SLIDRE, Apra Harbor was vital in terms of National Defense. It was utilized as a Navy base for nuclear submarines and other combatant vessels. The Navy had mooring buoys for deep draft vessels, including ammunition ships, in the vicinity of the stranded SLIDRE. Additionally, in the Outer Harbor commercial vessels would call at the port.

As set out in "An Evaluation of Apra Harbor, Guam, As A Typhoon Haven", prepared by the Naval Environmental Prediction Research Facility, and published in

November 1975,[1] 107 tropical cyclones passed within 180 miles of Guam during 1947–1973, i.e., an average of 4 per year. Thirty four of those resulted in winds of 22kt at Guam, and 8 resulted in winds of 34 kt or more at Guam, i.e., precursors of winds of typhoon intensity.

"Storm surge is a major problem in Apra Harbor. Typhoon conditions have created surges 10–12 feet above mean lower low water level." Typhoons KAREN, in 1962, and OLIVE, in 1963, were in this class, and damage to ships in the harbor was extensive. "There are no aspects of Apra Harbor that recommend it as a typhoon haven."

4. When the typhoon struck, the SLIDRE was owned by the Madrigal Shipping Company, Inc. (Madrigal) of the Philippines. It had been refitted and inspected in the Philippines in March, before going to Guam. It was unloading cargo and loading scrap in Guam just before the typhoon, but was then anchored out in the harbor to ride out the typhoon. The SLIDRE was about 250 feet long at the waterline. Its gross weight was about 1700 tons, with a net weight of 890 tons.

5. On June 15, 1976, the Coast Guard Captain of the Port wrote to the Guam agent for the SLIDRE requesting that the owners be notified of their obligation to remove the vessel, and that such action be commenced immediately as there was a probability the vessel would move and obstruct the Naval anchorages which were located in the near vicinity where the ship was grounded. The notice stated the Coast Guard had incurred over $25,000 in oil removal costs.

6. On August 5, 1976, the SLIDRE's agent notified the Coast Guard that Madrigal had sold the wreck to Wolder Salvage Co. of Whittier, California. Wolder Salvage Co. was but the business name of Wolder. Under the agreement of sale, Wolder assumed all liability and responsibility related to the vessel, including its removal. Also, the cargo of scrap steel and bundled lumber which was on board was subject to any interest which the owners of the cargo might hold. The vessel was sold to Wolder for a reported sales price of $50. Wolder testified that he had also "paid $5,000 under the table" "to a guy in Hong Kong" who'd made the sale for the ship's insurer.

7. On August 5, 1976, Wolder visited Minsky, the Chief of Guam Project Office (GPO), U.S. Army Engineer Division, Pacific Ocean, to establish liaison and to inform the Corps of his intentions to remove the SLIDRE. Wolder outlined his methods of removal, stating they would depend on the value of the vessel. One method he considered was to remove the vessel intact. Another would be to cut up the vessel in place and remove the scrap material for sale in the Orient. Minsky advised Wolder to contact the Coast Guard Marine Safety Office and the U.S. Naval Station and inform them of his plans, and also to keep the Corps advised of his plans.

8. As subsequent events illustrated, Wolder had but limited experience in marine salvage work. He had never attempted to remove a stranded ship from its strand. He had practically no salvage equipment and so little capital that he was constantly seeking "investors" in his $5,050 venture. Over the period October 16, 1976 through July 29, 1980, a Virginia Thomas of Placerville, California, "a partner", invested over $53,000 in the SLIDRE venture. He also had at least three other "investors": a personal friend, Powell, who lent him $10,000, a Mr. Stonestreet in Antioch, and a Bert (?) in Burlingame. Wolder subsequently brought in Robert Jordan (more, infra), who invested some $70,000 in equipment and machinery to attempt to remove some coral from under the ship. He also later secured an investment of about $29,000 in time and equipment from his "agent", Hinkle (more, infra). Although Wolder claimed to have invested some $100–$200,000 in the project, the exact amount of his own investments was not determined.

---

1. Def.Ex. 20

9. On August 11, 1976, Wolder met with representatives of the Navy and the Corps and requested the Navy's permission to use the Navy's Floating Crane. At that point, the Navy did not want to get involved in the removal. Wolder stated he did not anticipate the use of explosives since he believed the SLIDRE could be pulled off the reef after removal of her cargo. He further stated the vessel was quite secure and that only a severe typhoon could cause it to come off the reef.

10. On September 9, 1976, Wolder informed the Army Engineers that the cargo had been off-loaded of its scrap steel and lumber cargo two weeks before, and that his people were pumping water from the holds to determine the extent of damage. He anticipated refloating the ship but needed a place to moor it once refloated. He stated that the previous weekend's high-winds had rocked the vessel slightly and he hoped the SLIDRE would not work loose as deep water was only 40 feet away.

11. On September 10, 1976, Wolder informed the Corps by telephone that he was confident he would be able to pull the SLIDRE off the reef, claiming the vessel was almost afloat at that time. On October 7, 1976, Wolder said the vessel was prepared for towing off. Although he couldn't be contacted subsequently, on October 26, 1976, Cabras Marine, hired by Wolder, using two small tugs, attempted for less than two hours to pull the vessel off the strand. A line broke and the attempt was not repeated. The tugs were not specialized salvage tugs, of a total of about 1500 h.p.

12. On October 27, 1976, Wolder again reported to the Corps that the SLIDRE was ready to be pulled off its strand. At that time, Nippon Salvage Co., a Japanese company, was salvaging the wreck of the M/V CARIBIA which had sunk inside the entrance to Apra Harbor, and Wolder inquired about the use of a large floating crane owned by that company. He planned to use the crane to lift the stern of the SLIDRE and swing it out over the edge of the reef. He stated he would discuss this request with Nippon Salvage. He also re-ported finding a considerable quantity of oil on the vessel which he later estimated to be 40–60 tons.

13. Thomas L. Hinkle, who had worked for the Corps of Engineers from 1949 to 1965 and had been involved in construction in Vietnam—buildings, highways, bridges, and dock facilities—moved to Guam in 1975 where he engaged in salvaging scrap, as well as acted as agent for some ships. He had also done some salvaging of ships around Guam, so Wolder asked Hinkle to supply some labor and equipment—air compressors and other equipment. Hinkle went aboard the SLIDRE with Wolder to survey the condition of the SLIDRE and assist him, Wolder, in getting her off the reef. It was Hinkle who guaranteed payment for the attempt made by Cabras Marine. Hinkle said that he was but an investor with Wolder on the deal, and put about $29,000 into it. It was apparently Hinkle who suggested to Wolder that it would be necessary to remove some of the coral heads from under the SLIDRE before it could be pulled off.

14. Subsequently, Hinkle and Wolder's brother informed GPO that only two more patches and cutting of a small area of coral was required to free the vessel. They were notified that a Department of the Army permit might be required.

15. After returning to Guam on December 24, 1976, Wolder informed Minsky that coral-splitting equipment was expected to arrive during early January 1977 and predicted the SLIDRE would be afloat in two to three weeks. What Wolder did not inform Minsky was that he had made an agreement with Robert Jordan, a trenching contractor in the Sacramento area of California, with no prior marine trenching experience, to use Jordan's "expertise" and equipment in attempting to remove the coral from under the ship. Jordan, using a back hoe from a small barge, between January and April 1977, attempted to cut the coral from around and under the SLIDRE.

16. On February 24, 1977, Dillingham Corporation, using first two and then three tugs, attempted to pull the vessel off the

strand. The attempts lasted "about all day" and were unsuccessful. These tugs were ordinary ocean-going tugs—not specialized salvage tugs.

17. Wolder left Guam and did not again return until May 10, telling GPO he intended to resume removal efforts and again stated he hoped to achieve removal in two weeks.

18. Jordan reported to the Army Engineers, on June 6, 1977, that he and a Donald Doug Wilson had removed visible coral heads around the SLIDRE but the SLIDRE still could not be pulled free. He stated he believed that pinnacles under the vessel were holding it in place. Minsky, at his request, introduced them to Noguchi, Salvage Master for Nippon Salvage Co.

19. After that meeting, Noguchi stated that those gentlemen wanted to rent his firm's 500-ton floating crane but he had refused the request since the crane was then in daily use on the salvage of the M/V CARIBIA, and the crane was committed to a job in India as soon as the CARIBIA work was completed. He stated that he could have assisted them up until about six weeks earlier, but they had never requested such assistance.

20. Jordan thereafter shipped most of his equipment back to the states. Jordan testified that in April 1977, in return for a loan as well as the work that he had done and proposed to do, he became a partner with Wolder in the salvage effort. At first, he was to get one-third, and then it was changed to 50% of whatever they could get from the SLIDRE if they removed it. Jordan stated that he had invested about $70,000—loans and expenses—in the venture, and that he had left behind on Guam an electric welder and power unit, a pump, and a Volkswagen.

21. On July 5, 1977, Wolder first inquired about a Department of the Army permit for using explosives to blast the coral under and around the vessel. He claimed he had exhausted all other methods of removal. Wolder submitted a permit application, dated July 15, 1977, with an environmental assessment attached. His application indicated that only small charges of explosives placed in pre-drilled holes would be used to fracture the coral to allow the vessel to slide over smooth coral into deep water. The stern was allegedly in sufficient water to float. His assessment indicated only two coral pinnacles would have to be shattered.

22. The Corps did not have any objection to granting the permit but, in accordance with required procedure, distributed the application and assessment to concerned Federal and Island Government Agencies for their review and comments. None of the Federal Agencies voiced any objection to the issuance of a permit. The Commander, 14th Coast Guard District, stated that with the typhoon season then threatening the area, it was desirable to have the SLIDRE floated off the reef as soon as possible.

23. The Guam Environmental Protection Agency and the Aquatic Wildlife Resources Division recommended denial of the permit until the nature of the blasting operation was specified in detail. A representative of those Guam agencies questioned the accuracy of Wolder's environmental assessment and other statements made in his application based upon their personal observations of the situation related to the quantity of blasting required and the lack of detail concerning his blasting methods. They did not recommend outright rejection of the permit but stated they wished to meet with Wolder to discuss the procedures to minimize any damage to the environment. They, too, acknowledged that the vessel had to be removed.

24. On August 25, 1977, the Corps' Division representative in Honolulu forwarded a copy of the Aquatic Wildlife's letter to the plaintiff, with a copy to his attorney, and requested that Wolder reply directly to Aquatic Wildlife, with a copy to Division.

25. No reply was received and, after 45 days, the District Engineer in Honolulu notified Wolder that the application would be considered withdrawn if Wolder made no response within 30 days of receipt of the

second letter. A copy of this letter was forwarded to Wolder's California and Guam addresses as well as to his attorney, who had been listed on the application.

26. By reply letter, dated October 29, 1977, Wolder apologized for not having answered sooner and claimed he planned to meet with the staff of the Guam agencies.

27. During a November 28, 1977 telephone conversation, Wolder informed Minsky that he was back on Guam ready to resume efforts to remove the SLIDRE. He said that since he was unable to satisfactorily resolve the concerns of the Guam Government, he intended to withdraw the permit, and was then considering removing all machinery from the vessel and cutting the hull for scrap.

28. By letter, dated November 29, 1977, Wolder requested withdrawal of his permit application since (unspecified) recent developments had made it unnecessary to use explosives. On November 29 Wolder also met with Minsky and reviewed the Aquatic Wildlife letter. Although the letter objected to the blasting, it indicated that those objections might be overcome if Wolder would provide details regarding the blasting and provide a plan that more accurately reflected the actual quantity of blasting required.

29. During the November 29 meeting with Minsky, Wolder reported that the SLIDRE had shifted slightly as a result of a tropical storm in October 1977, and that the bow moved slightly toward deeper waters which might make blasting unnecessary. Wolder said he was still considering two options: (1) removing the machinery and cutting the hull for scrap, and (2) pulling the vessel off the reef as initially intended. He was going to determine his course of action after a November 30 meeting with unnamed private parties.

30. On December 2, 1977, Wolder telephoned Minsky to say he would submit a letter withdrawing his permit application. Apparently, this letter was the letter dated November 29, 1977, which was received on December 8, 1977, by Minsky. Wolder also stated he would leave Guam on December 2, but would return during the first week of January, 1978, and promised the SLIDRE would be removed within two weeks after his return either by using tugs to pull it off the reef or by using hydraulic rams.

31. When no word had been received from Wolder by March 22, 1978, Minsky, by letter, requested Wolder to provide a removal plan by April 7, 1978. Minsky stated that a prompt removal was needed in view of the obvious danger to navigation which would result in the event a severe storm struck Guam and caused the SLIDRE to sink in the navigable channel.

32. Wolder then informed Frank Dayton, who later relieved Minsky, that he was still considering his two options and, further, was discussing the salvaging of the SLIDRE with an unidentified Korean firm. Subsequently, Minsky received a "To Whom It May Concern" notice, dated April 4, 1978, which was signed by Wolder stating that title and all responsibility for the SLIDRE had been transferred to Eagle Corporation, Inc. (Eagle), as of the aforesaid date. Copies of this notice were furnished to various Federal agencies.

33. Minsky, by letter dated May 3, 1978, wrote to Eagle advising that corporation of its responsibilities and obligations to other navigational interests using the waters of Apra Harbor. He requested an opportunity to discuss these. There was no response to this letter, and Minsky wrote again on May 24, 1978, and again requested an opportunity for a meeting.

34. On June 6, 1978, Minsky and Dayton met with Mr. Kang, the President of Eagle, to explain Eagle's responsibilities and obligations and to inform Kang that if the SLIDRE floated free he would be financially responsible for its removal. Kang described his plan of removal, which included, among other things, the hiring of technicians to supervise the removal operations, the use of floating equipment to remove the superstructure and side plates, and then the towing of the hull to the Dillingham docks for final cutting up. Prior to commencing removal operations, he

intended to remove the remaining fuel oil. Kang said the removal operation would begin by the end of the month, i.e., June 1978.

35. By notice dated August 10, 1978, Eagle sent various agencies a copy of the removal schedule for the SLIDRE.

36. According to the bill of sale, Eagle had bought the vessel for $45,000, paying $10,000 down to Wolder, with the balance to be paid within 180 days.

37. The Corps, by letter of September 15, 1978, advised Eagle that no permit would be required if the SLIDRE was removed according to the proposed plans. Eagle was advised to coordinate its removal plans with the Navy, Coast Guard, and the Government of Guam before taking any removal actions.

38. On September 17, 1978, the Coast Guard again wrote the Corps of its concern regarding the three stranded vessels, which included the SLIDRE, as posing a threat to the environment and navigation. Included in that letter was a letter and a message from Allgreen Enterprises (Allgreen) offering to remove all three stranded vessels at no costs to the Government. Captain (then Commander) Franke of the Coast Guard had met with the two principals of Allgreen and was neither impressed with their salvage capability nor their facilities for removing the vessels which included the SLIDRE, PEACE OCEAN, and MARIA I. Dayton of the Corps advised, on October 11, 1978, that he had not been able to contact Allgreen. Nothing was ever heard of Allgreen after that time.

39. In the meantime, Kang had contracted with Dillingham to remove oil from the SLIDRE and had made arrangements with Dillingham to rent a barge-mounted crane and a tugboat on an "as needed" basis.

40. By November 1, 1978, Eagle had Dillingham remove 9,000 gallons of oil from the SLIDRE and indicated an intention to remove the engine and enough equipment so that the ship could float free and subsequently be towed to Taiwan for scrapping.

41. By mid-January, 1979, Dayton, who had become the Chief of Guam Project Office, Minsky having departed the Island, heard that ownership of the SLIDRE might have reverted back to Wolder and wrote to Wolder requesting confirmation of his ownership. Dayton also inquired of Kang about the ownership situation.

42. Wolder stated that Eagle had not followed his guidelines nor fulfilled the contract. He promised to call on Dayton to discuss salvage and methods of removal operation.

43. In mid-April, Wolder advised Dayton by telephone of his new plan of action. Wolder said he intended to scrap the superstructure in place, pull the lightened hull off, and then sell it.

44. Sometime during May, 1979, Tim Abbey, another of Wolder's "agents" on Guam, stated that cutting up of the SLIDRE had begun but the work was slower than expected. According to this plan, all of the metal down to E-deck was to be removed, as well as the engines, and then the remaining hull would be pulled off. A representative of the Corps attempted to contact Abbey on seven occasions through July and August. No one answered the telephone.

45. By letter dated August 28, 1979, Dayton inquired of Wolder whether the latter had sold the vessel to a Mr. Hanley and requested a copy of the sales agreement and Hanley's address. Again, the Corps expressed its concern for the removal of the SLIDRE since Guam was in the midst of another typhoon season.

46. Hanley, the President of Steelcraft Marine, sent a letter, dated August 29, 1979, to the Commander, U.S. Naval Forces, Marianas, requesting their assistance in removing the SLIDRE from the reef. Hanley stated that Wolder would indemnify the Navy and hold it harmless for the removal of the vessel, as well as reimburse the Navy for all costs incurred in the removal. Wolder, by letter of September 1, 1979, claimed ownership of the vessel, indicating he had contracted with

Hanley to participate in the salvage effort. Hanley was to cut off the sides and topside gear. According to Wolder, although Hanley had done some cutting, his delay in commencing the work caused a potential buyer to "back off." Also, Dillingham had quoted a price of $100,000 a day for use of its crane, barge, and tug, but Wolder questioned the capability of that equipment to perform the required work. Further, Wolder was certain that the removal of 100 tons off the topside would enable him to pull the vessel free without any problems. Finally, he indicated he would return to Guam shortly and resolve this situation.

47. There were no local facilities, tugs or cranes, available on Guam, private or Government, which were capable of removing the vessel. A large salvage tug, with special equipment, or a large crane and barge would have to be brought from off the Island. Wolder knew that private salvage companies with heavy salvage equipment were located in Manila, Singapore, Japan, and the United States, but he did not enter into an agreement with any of them, maintaining that the cost was prohibitive.[2] The SLIDRE could have been cut up on the site but, again, Wolder did not pursue this alternate course.

48. The Navy, through its personnel at COMNAVMARIANAS, indicated a willingness to provide Navy assistance, when available, if Wolder would execute a hold-harmless agreement, pay the cost of removal, and meet other necessary requirements.

49. The Navy arranged for the USS BOLSTER, a seagoing salvage vessel, to perform a salvage survey at Guam when the vessel stopped in that port during a short stopover while proceeding on its regularly scheduled activities to the Far East. A meeting was ultimately scheduled to be held aboard the vessel during the latter part of October, 1979.

50. Two days prior to the scheduled meeting, Wolder met with Commander Ryland to discuss the possibility of the Navy's assisting in the removal of the vessel. Ryland emphasized the need for a hold-harmless and reimbursement agreement and the fact that Hanley's letter was a positive step in that direction. More importantly, Wolder would have to make provision for the handling of the vessel as soon as it had been removed from the strand. Specific and definite arrangements had to be made as to where the vessel would be taken upon its removal—if able to stay afloat. Wolder clearly indicated that this would not present a problem.

51. The crew of the BOLSTER performed a preliminary salvage survey to determine the possibility of pulling the vessel off the strand. On October 25, 1979, a meeting was held aboard the BOLSTER which was attended by representatives of the Navy, Corps of Engineers, Coast Guard, members of the crew of the BOLSTER, and Wolder and some of his cohorts. The preliminary survey was discussed. The BOLSTER crew had concluded that it was possible to pull the vessel off.

52. After that part of the discussion had taken place, Wolder was then asked by Commander Ryland where the vessel would be taken upon its removal. Wolder stated that he was unable to make arrangements for any pier facility, indicating clearly that he did not have the financial ability to meet any such expense. Wolder asked whether the vessel could be pulled off the reef on the southerly edge of the harbor, brought due north to the northerly edge of the harbor, and beached alongside the breakwater. This request was immediately and emphatically denied as no Government agency wished to have the vessel removed and then beached in a different area. The vessel in that new location would again be

---

**2.** At trial, Wolder's expert marine surveyor, Harry Naftel, testified that by using a 10,000 horsepower salvage tug, several of which were available in Singapore, plus hydraulic jacks available in Honolulu, it would have taken 4 days to pull the SLIDRE off the strand. He stated that the tugs charged $6,500 a day; that it would take 5 days each way from Singapore to Guam; that the jacks would cost $1,000 a day; and that he would have "jumped at the chance" to have contracted to pull off the SLIDRE for $100,000.

subject to movement by typhoons and would still create a potential hazard to navigation.

53. At that meeting, all parties present clearly indicated that they considered the vessel a potential hazard to navigation at its present stranding position and that it would create a similar problem if beached anywhere else.

54. Ryland asked Wolder to inform him within the next couple of days of his (Wolder's) intentions. Instead, Wolder left the Island soon thereafter.

55. During the meeting, Wolder made no mention of Hanley's status as Wolder's representative. Instead, by letter dated October 26, 1979, addressed to Hanley, Wolder stated that Hanley's contract had expired on July 29, 1979, prior to Hanley's "hold harmless" offer of August 29, 1979, and that Hanley was not Wolder's agent on Guam subsequent to that time. The letter stated Wolder had no authorized agent on Guam. He also accused Hanley of removing equipment after that date and of cutting a hole in the vessel's side below the waterline creating a hazardous condition. A copy of this letter was sent to the Corps and other Federal Agencies on Guam.

56. The BOLSTER, in the meantime, completed its salvage survey and a proposed plan for the removal of the vessel. Some questions arose as to the calculations for the pull required by a salvage vessel, and the Navy in Honolulu sent a representative of the Salvage Office to Guam to perform another survey. That representative recalculated the pull required, resulting in a requirement almost three times higher than the BOLSTER's calculation but, again, determined it was feasible to pull the vessel off the strand.

57. In the meantime, the Navy Representatives on Guam informed the Navy in Honolulu of the situation that existed; that Wolder had disappeared; that there was apparently no chance of success of getting Wolder to remove the vessel or of getting Wolder to hold the Navy harmless, referring to Wolder's rejection of Hanley and the latter's authority. This report re-emphasized that the SLIDRE constituted a potential hazard to navigation.

58. On January 27, 1980, CINCPACFLT, Honolulu, sent a message to the Corps reviewing the situation and its belief that the SLIDRE was a potential direct threat to general navigation in the harbor. The message noted that the hulk was deteriorating and that a typhoon could place the vessel in the navigable channel. The Navy salvage experts advised that even if the vessel was badly holed, it could still be removed from the reef.

59. On February 4, 1980, the Division Engineer informed the Chief of Engineers, Washington, D.C., that the SLIDRE was considered a potential hazard to navigation. On February 8, 1980, by letter, Colonel Schlapak, the District Engineer, Pacific Ocean Division, notified Wolder (with a copy to CINCPACFLT), that the SLIDRE was a potential hazard to navigation and its removal was his (Wolder's) responsibility under Section 19 of the River and Harbor Act of 1899. 33 U.S.C. section 414. Wolder was asked to submit, within thirty days of receipt of the letter, his proposed plan and schedule for removal. Colonel Schlapak warned him that the Corps might undertake the removal at the owner's expense if no response was received or if the response was untimely or unacceptable. Wolder acknowledged receipt of the letter on February 13, 1980.

60. Wolder responded by letter, dated March 8, 1980, stating he was awaiting notification of the return of a Navy tug which was supposed to pull the vessel off the reef and that the Navy expected the tug in February or March, 1980. Further, Wolder, according to the letter, was negotiating with two firms to cut the ship down. The letter contained no details as to how Wolder would accomplish the removal, in either case.

61. Wolder's March 8 letter did not make any reference to indemnifying the Navy or holding that agency harmless for removal of the vessel and, most important-

ly, did not state where the vessel would be brought once it was removed.

62. On April 3, 1980, the District Engineer, by letter, notified Wolder that the latter's response in the March 8 letter was insufficient to show how the vessel would be removed in the foreseeable future. Additionally, the District Engineer noted that the Navy had required Wolder to identify the berthing site before the Navy would agree to assist him in the removal. The District Engineer requested Wolder to provide that site before May 1, 1980 or failure to do so would force the Corps to undertake the removal at Wolder's expense. The District Engineer further wrote that if the Corps had to remove the SLIDRE, the vessel would be towed to deep water and sunk for use as an artificial fish reef. The letter was addressed, correctly, to Wolder's California address. It was returned undelivered.

63. In accordance with Section 19 of the River and Harbor Act of 1899 (section 414), a public notice was published in the Guam local newspaper stating that after 30 days from the date of first publication of the notice, the SLIDRE would be subject to removal or other disposition as a hazard to navigation. Such removal would be as provided by law unless prior removal was accomplished by the rightful owner. The last known owner of the SLIDRE, according to the publication, was Ernie H. Wolder.

64. The notice was published in the Pacific Daily News, Guam, on June 4, 11, and 18, 1980. The thirty-day period expired on July 5, 1980. No response was received to that notice.

65. Thereafter, on July 7, 1980, the Division Engineer determined it was in the best interest of the United States to allow the Navy to remove the vessel in lieu of advertising the vessel for sale and salvage. That determination indicated that the decision to allow the Navy to salvage the SLIDRE and scuttle her was made because of the deteriorated condition of the vessel, the lack of action to remove her, and the upcoming typhoon season.

66. On that same day, July 7, 1980, Wolder called Colonel Schlapak. Colonel Schlapak granted Wolder seven days to submit a letter spelling out his intentions. No letter was received by July 14, 1980.

67. Wolder, by letter dated July 11, 1980—the letter actually having been received by the Corps on July 18, 1980—complained about encountering obstacles from various Federal and Guam agencies and indicated he would seek permission in writing from the Navy or whoever claimed jurisdiction, to cut the vessel where she was. Finally, he indicated he would attempt to take legal action to prevent any declaration that the vessel was a menace to navigation. Again, Wolder did not give any specifics as to removing the vessel, reimbursing and indemnifying the Navy if the Navy removed the vessel, or where the vessel would be taken if it was floated off.

68. On July 14, 1980, the Corps formally requested the Navy's assistance in removing and disposing of the SLIDRE.

69. By letter, dated July 23, 1980, Wolder wrote to Dayton and stated that he would have some people on Guam in the hope of towing the vessel to another port for "graving." If that was impossible to accomplish, he intended to seek, in writing, permission of the Navy to cut the vessel up or until floatation of the bottom could be achieved at the site. He did not name the individuals who were to perform the work.

70. In the meantime, the USS BRUNSWICK, a seagoing salvage tug, had arrived on Guam. Plans were compiled for the removal of the vessel and removal attempts commenced. Extensive pumping and removal of loose debris and oil-polluted water was required. Topside weight such as masts and booms were removed by both explosive and oxy-acetylene cutting. Temporary plugging of numerous hull holes was required wherever the source of the leak could be located. On the 2nd and 3rd of August 1980, the BRUNSWICK, along with two YTB's, failed to remove the vessel while exerting a pull of approximately 130 tons. Two attempts were made.

71. On August 4, 1980, a further survey was made of the ship and additional planning undertaken. By August 12, 1980, the stack, aft deck house, and the forward deck house were removed. Special patches were placed over the cargo deck manholes. Approximately 200 tons were removed from the topside. Additionally, four beach gear legs were rigged and a pulling barge equipped with a winch to add pulling force.

72. The vessel was finally pulled off the strand and, with the use of pumps and air pressure to prevent water from entering holes in the hull, the vessel was towed approximately 7 miles south of the entrance to Apra Harbor and it sunk in 600 feet of water.

73. At all times involved herein, i.e., from the time of its stranding, the SLIDRE constituted a potential hazard to navigation. Although the vessel appeared hard aground under good weather and sea conditions encountered in the harbor, Wolder, from time to time, reported it as moving and it was a real possibility that another typhoon could lift it off the strand and into navigable areas.[3]

74. At all times involved herein, the United States Government, through its various agencies, acted reasonably and was not, in the slightest, negligent in removing and sinking the SLIDRE.

75. The total cost to the Navy for the removal of the vessel was $464,703.14.

76. The value of scrap in Guam was $70 per ton. The value in Taiwan was $130, delivered. This did not include the cost of cutting up the vessel while on the strand, or the cost of removal and towage if the vessel were pulled off intact and brought to the port where it would be sold. As noted previously, the vessel weighed approximately 980 tons.

77. Based on the value of scrap in Taiwan, without considering the costs which Wolder would have to incur in removing the vessel or cutting it up and then delivering the vessel or the cut-up scrap, even if the Government were liable, plaintiff would have secured $127,400. Even assuming an additional $25,000 value for miscellaneous equipment, the money received for scrapping would be far below the actual cost of the removal of the SLIDRE. Thus, even considering Wolder's estimate of values, plaintiff did not suffer any damage as a result of the Government's removing the vessel.

78. The actions of Wolder and his various "agents" were completely ineffectual in his attempts to remove the SLIDRE over the four years after it had originally stranded. Although the vessel always constituted a potential hazard to navigation, Wolder was interested only in removing the vessel in a manner which would result in a profit to him. As owner of the potential obstruction, he had the obligation and the responsibility to remove the SLIDRE. He failed to do so within a reasonable time, and the Government, after having heard him promise many, many times to have the SLIDRE off its strand "in a couple of

---

**3.** At trial, Harvey Minsky testified:

"What made me stay with my opinion [that the SLIDRE was at all times a possible hazard to navigation] was very heavily weigh[t]ed on the comments that Captain Wolder himself was making to me; and what he was leading me to believe was the actual condition of the vessel at our many meetings and conversations ... He led me to believe that he had a vessel that could float, that was watertight; that merely had to be pulled off the reef; that it had moved on several occasions, not typhoon occasions either; that he was merely waiting for the right opportunity to go over and just pull it off the reef ... I envisioned a vessel that could be easily pulled off the reef, now a vessel that is floating around the harbor, just floating around Apra Outer Harbor, it could float into Apra Inner Harbor which is very critical to the Navy's needs on the Island. It could float over to the commercial port. It could float over to the Dillingham facility; a vessel just floundering. At any time it could hit any point on the reef, within the harbor, it could hit the breakwater; it could sink any place in the harbor, in the outer harbor, in the inner harbor; in Sumay Cove adjacent to the commercial port. I envisioned a floundering vessel. Based on that, I said we have a potential hazard to navigation."

weeks," exercised extreme patience and acted most reasonably in finally taking action in the manner specified by 33 U.S.C. section 414 and removing and sinking the SLIDRE.

## CONCLUSIONS OF LAW

■ Under 33 U.S.C. section 414, when the Secretary of the Army (through its agency, the Army Corps of Engineers), in the exercise of sound discretion, determines that navigable waters of the United States are obstructed or endangered by any wreck, it may remove the wreck without liability for any damage to the owner thereof. Contrary to plaintiff's position, it is not necessary that the wreck be a present, actual obstruction to navigation before action can be taken by the Corps under section 414. The Corps is not compelled to wait until a wreck actually and presently interferes with safe navigation in the area. If a wreck endangers, i.e., poses a potential hazard to navigation under conditions which may be reasonably anticipated to occur, the Corps can act under the powers given it under section 414.

■ As said by the Fifth Circuit Court in *Agra-Trans Corporation v. Gladders Barge Line, Inc.*, 721 F.2d 1005, while

the Wreck Act [section 414] does not clearly refer the determination of whether a wreck poses an obstacle to navigation to the unreviewed discretion of the Corps of Engineers ... the determination of whether a wreck poses an obstacle ... rests initially with the Corps and that determination will be overturned by a reviewing court only if it is arbitrary or capricious.

■ The record clearly shows that the determination by the Corps to undertake the removal of the SLIDRE was arrived at only after all of the facts and factors in-

volving the stranding of the SLIDRE, the four-year-long failure of the owner to remove it from the strand, the knowledge of the hazards to navigation brought on by the tropical cyclones that rack and wreck Guam almost seasonally, and the recognition of the danger to navigation in the harbor which would be imposed if a typhoon should move the SLIDRE from its strand, had been taken into consideration. The ultimate decision to remove it was fully reviewed by the Chief of Engineers, Washington, D.C., the Division Engineer, and the District Engineer, Pacific Ocean Division, of the Corps before the Corps authorized its removal by the Navy.[4] The Corps made a well-founded administrative decision that the stranded SLIDRE was a potential danger to navigation in Apra Harbor.[5] Thereafter, full statutory notice was given to Wolder that the Corps was going to remove the SLIDRE. Even after that notice, Wolder was given an opportunity to undertake his own salvage of the vessel. Wolder did nothing except talk about what he proposed to do. The action of the Corps was not in the slightest arbitrary or capricious. It was based upon four years of study, analysis, and concern for navigational safety in Apra Harbor.

Neither the Corps nor the Navy owed any obligation to Wolder to deliver him the hulk after it was removed.[6] This would be so even if Wolder had had the tugs and berthing arrangements all ready to take over the SLIDRE after it came off the reef. Here, however, Wolder only verbalized about taking over and berthing the hulk. He did nothing to implement his words.

As is clearly set forth in the Act, the Secretary of the Army may dispose of a wreck in any manner which, in his discretion, he deems reasonable "without liability for any damage to the owners of the same" (section 414).[7] The United States is not

---

**4.** See Findings 59, et seq., supra.

**5.** *Cf. Agri-Trans Corp. v. Gladders Barge Line Inc.*, 721 F.2d 1005 (5th Cir.1983).

**6.** *Zubic v. United States,* 190 F.2d 278 (3d Cir. 1951).

**7.** *Buffalo Bayou Transportation Company v. United States,* 375 F.2d 675, 677 (5th Cir.1967)

liable in any way to Wolder for the removal and sinking of the SLIDRE.

Wolder also claims that the government acted unconstitutionally by way of tort in removing the vessel. Under the Tort Claims Act, the United States did not waive its governmental immunity from suit in admiralty for torts. Thus, plaintiff's tort claim is without merit. Moreover, this court would be without jurisdiction to adjudicate a claim against the United States for any unconstitutional acts which exceeded $10,000 in damages [8]. As a matter of law and fact, there was never any agreement between Wolder and the Corps or the Navy, i.e., the United States, by which the Navy was required to remove the SLIDRE for and on behalf of Wolder. The record is clear that although the Navy might, at one time, have been willing to pull the SLIDRE off for Wolder, Wolder never complied with the Navy's requirement that a hold-harmless and reimbursement agreement be signed by Wolder.

Let JUDGMENT be entered for the Defendant United States and against the Plaintiff Wolder.

IT IS SO ORDERED.