**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Michael R. RAVEN, Defendant-Appellant.**

**No. 74–1816.**

**Summary Calendar.***

United States Court of Appeals,
Fifth Circuit.

Sept. 20, 1974.

---

* Rule 18, 5 Cir., Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al., 5 Cir., 1970, 431 F.2d 409, Part I.

Stephen P. Smith, III, Jacksonville, Fla. (Court-appointed), for defendant-appellant.

John L. Briggs, U. S. Atty., Howard T. Snyder, Asst. U. S. Atty., Jacksonville, Fla., Wallace H. Johnson, Edmund B. Clark, Dirk D. Snel, Attys., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, and THORNBERRY and AINSWORTH, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The odyssey of the M/V ECLYPSE— a 83′ two-masted woodenhull schooner —in the Port of Jacksonville, Florida was brief but perhaps too long. As a result of her shortened, but lengthened, stay, Raven, her owner, was convicted by a federal jury of the three misdemean-

ors (i) failing to properly mark a sunken vessel, (ii) obstructing a navigable waterway and (iii) failing to remove a sunken vessel. He was sentenced to 30 days suspended sentence on each of these counts to run concurrently. Because we affirm his conviction on (i) and (ii), under the concurrent sentence doctrine we do not reach his challenge to (iii).[1]

During the summer of 1973, Michael R. Raven brought the ECLYPSE into the harbor at Jacksonville, Florida. According to his story, which is the heart of most of what we describe, the presence of the vessel apparently provoked great concern on the part of the Jacksonville Sheriff's Office. Believing apparently that he was suspect to the authorities,[2] Raven thought better of berthing the vessel at a private dock and removed it to an anchorage in the St. Johns River. But this was no haven. For soon afterwards a violent storm swept the ECLYPSE into the Fuller Warren Bridge, which spans the river. The ship was damaged severely. With planks and beams started and the hull already leaking, Raven on September 23, 1973 decided to move the ECLYPSE up river to Goodbye's Lake where he grounded her toward the river's easterly shore.

Despite Raven's efforts—which the jury thought inadequate—to pump out the vessel and raise it, she settled further into the water so that it was plain she was not a vessel either afloat or navigable.

Then came the perils, not of the sea, but of the establishment as it is personified in the Corps of Engineers.[3]

On September 20, 1973 the Jacksonville Corps of Engineers sent Raven a letter in care of his local attorney[4] complaining that his sunken vessel was obstructing and endangering navigation. He was ordered to mark the ECLYPSE by buoy and lantern, take immediate action to remove it, and advise the Corps within the week of his plans. Raven did not respond to the letter and the Corps referred the matter to its District Counsel. Again on November 23, 1973 another letter was sent to Raven warning him that if the obstruction was not removed, the Corps would recommend to the United States Attorney that appropriate criminal and civil action be commenced. This letter was sent this time to him both at his California address and in care of his counsel.

Whatever the reasons for not receiving these patient letters or acting upon them, Raven delayed any action until he received final impetus from the United States Attorney in the form of a letter requesting that Raven contact him before the close of business on December 12, 1974 "to forestall the legal actions contemplated." In response, Raven, choosing his own methods, advised the Government Counsel that he would not visit his office for the suggested conference and that the ECLYPSE would be raised on Saturday or Sunday. The same day the Assistant U. S. Attorney filed the three-count information and Raven was arrested on Saturday morning while trying to salve the ECLYPSE.

After a lengthy trial the jury returned a verdict of guilty on all counts. The sentence was relatively slight, 30 days on each count to run concurrently which was thereafter suspended by the Judge. Raven, with the true heart of the sea lawyer, appealing to the liberality of the admiralty, brings this to us on principle, not principal.

1. Rogers v. Wainwright, 5 Cir., 1968, 394 F. 2d 492.

2. Raven has a civil rights suit pending against the authorities in the federal court presumably for interfering with his civil rights.

3. The chronicle which follows is stated because that counsel thought his responsibili- prosecution.

4. His present counsel was appointed under the Criminal Justice Act. We cast no discredit on this counsel, as the record indicause of Raven's charge of undue selective ties confined to civil rights not, as we phrase it, maritime wrongs.

Each of the counts of the information charged a continuing violation of the specified section as "beginning . . . on . . . the 21st day of September, 1973 and continuing until the 12th day of December, 1973 . . . ". The specifics were (i) obstructing navigation (ii) failure to light and mark and (iii) failure to remove.

### Obstruction of Navigable Waters
### 33 U.S.C.A. § 403 [5]

Raven challenges Count I charging him with creating an obstruction by permitting the ECLYPSE to sink and remain sunk in the St. Johns River on the grounds that (1) § 403 does not specifically refer to vessels, and (2) § 403 requires the specific intent to obstruct the waterways by affirmative, deliberate acts.

■ We find no merit in this or the related contention that the evidence was insufficient. Nothing could be more of an obstruction to navigation than a sunken vessel either in or near waters that are open for the use of others. If floating particles can be an obstruction, certainly an 83 ft. schooner, as here, can be. See United States v. Republic Steel Corp., 1960, 362 U.S. 482, 487, 80 S.Ct. 884, 4 L.Ed.2d 903.[6]

■ As to the charge that the acts must be deliberate, the words "knowingly and negligently" were struck from the charge on Raven's own request. Even so, the proof showed a deliberate act which eliminated any question on that score.

We do mention at this point our concern expressed later regarding the duty to remove, that we do not hold—or even imply—that the purposeful stranding of a vessel to salve her constitutes a § 403 obstruction no matter how much she intrudes into the channels of navigation. What we are dealing with here is a continuous act for nearly three months during which the perils assayed in the deliberate grounding could readily have been averted.

### The Duty to Mark And Remove Sunken Vessels
### 33 U.S.C.A. § 409 [7]

Counts II and III of the Information charged that Raven:

### II

. . . did knowingly and willfully neglect or fail to immediately mark

---

5. § 403. *Obstruction of navigable waters generally; wharves; piers, etc.; excavations and filling in*

The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same.
Mar. 3, 1899, c. 425, § 10, 30 Stat. 1151.

6. The contention also contradicts the law of this Circuit, United States v. Cargill, Inc., 5 Cir., 1966, 367 F.2d 971, aff'd sub nom. Wyandotte Co. v. United States, 1967, 389 U.S. 191, 196, 203, 88 S.Ct. 379, 19 L.Ed.2d 407. This Court in *Cargill* (at 975) held that "it is illogical to conclude that a vessel is not an obstruction" under 33 U.S.C.A. § 403 merely because this is given separate treatment under 33 U.S.C.A. § 409; the latter statute, this Court reasoned, "seems more likely to be just an emphatic restatement of the Section 10 (33 USCA § 403) prohibition against creating an obstruction. . . ."

7. § 409. *Obstruction of navigable waters by vessels; floating timber; marking and removal of sunken vessels*

It shall not be lawful to tie up or anchor vessels or other craft in navigable chan-

such sunken craft with a buoy or beacon during the day and a lantern at night and to maintain such marks until the sunken craft was removed or abandoned . . .

### and 111

. . . did knowingly and willfully fail to commence the immediate removal of the same and to prosecute such removal diligently . . .

■■ Raven argues that these counts fail to state a valid charge because § 409 by its language does not reach a vessel grounded in the peculiar circumstances of the ECLYPSE. First, he would have us read the statute as imposing a duty to mark solely on the owners of those crafts that are *both* wrecked and sunk in a distinct, navigable channel. This contention is meritless. Congress did not intend § 409 to be so meager as to extend only to those vessels that are sunk as a result of wrecks and exempt those equally-hazardous derelicts sunk due to other causes.[8]

■■ The purpose of this statute is the protection of other vessels plying the same waters. Consequently it is similarly unnecessary for the govern-

ment to prove that the ECLYPSE was swamped in a distinct channel since the evidence demonstrated that she was stranded in navigable waters capable of sustaining the traffic of other vessels.[9] Indeed, the fact that the ECLYPSE could get as far as to be stranded proves navigability as she went purposefully aground.

■■ Although we find § 409 applicable and the proof sufficient to establish that these actions were "voluntarily or carelessly sink, or permit or cause to be sunk [the ECLYPSE] in navigable channels . . ." (See note 7 *supra*), we expressly pretermit affirmance on this count under the concurrent sentence doctrine.[10]

We do this because there are inescapable problems of great magnitude—some perhaps of constitutional proportions—in the use of a criminal sanction to punish one for the failure to pay out money to remove the wreck without a showing (i) that in a civil proceeding the government would legally be entitled to recover the costs and, perhaps more decisively (ii) the respondent was financially able to respond.[11]

---

nels in such a manner as to prevent or obstruct the passage of other vessels or craft: or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as "sack rafts of timber and logs" in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject

the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title.
Mar. 3, 1899, c. 425, § 15, 30 Stat. 1152.

8. See Hickman v. Taylor, 3 Cir., 1948, 170 F.2d 327, 329, cert. den., 336 U.S. 906, 69 S.Ct. 485, 93 L.Ed. 1071, 1949, where the Court in dicta recognized that the failure to mark a sunken but intact carfloat that later resurfaced violated § 409.

9. Kaiser v. Traveler's Ins. Co., E.D.La., 1973, 359 F.Supp. 90, 94 (sunken vessel tied to bank and "immediately adjacent thereto",) Reading Co. v. Pope and Talbot, Inc., E.D.Pa., 1961, 192 F.Supp. 663, 666, aff. 3 Cir., 1961, 295 F.2d 40; Red Star Towing and Trans. Co. v. Woodburn, 2 Cir., 1927, 18 F.2d 77, 78.

10. Lydy v. Beto, 5 Cir., 1968, 399 F.2d 59; Rogers v. Wainwright, 5 Cir., 1968, 394 F.2d 492.

11. Tate v. Short, 1971, 401 U.S. 395, 91 S. Ct. 668, 28 L.Ed.2d 130.

 Sweeping as are the obligations under the Rivers and Harbors Act, the duty to *pay* is confined to those who negligently cause the obstruction. Wyandotte Co. v. United States, 1967, 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407. Where the owner does nothing, as here, so as to bring about a constructive abandonment (see 33 U.S.C.A. § 409, note 7 *supra*) and the government likewise does nothing except prosecute criminally, to subject him to a criminal sanction is to prejudge both his ultimate *Wyandotte* civil liability and his financial ability to pay. Considering that maritime laws encourage all efforts to salve ship, cargo, and persons,[12] each is wrapped up either in civil uncertainty[13] or in the prospect obnoxious to the Twentieth Century of the debtors gaol.

### Unfair Prosecution

Lastly, Raven argues that this conviction should be set aside because he was singled out as the first subject of a criminal prosecution based on these statutes in the Jacksonville area, despite the presence of numerous derelicts lining the river. He points to the absence of a civil prosecution by the government as evidence that the intent of the government was to harass alone. Even assuming that appellant may challenge the prerogative of the Executive to commence criminal actions—highly doubtful in the face of United States v. Cox, 5 Cir., 1965, 342 F.2d 167 (Brown, J. specially concurring), cert. den., Cox v. Hauberg, 381 U.S. 935, 85 S.Ct. 1767, 14 L.Ed.2d 700—none of the evidence offered required the trial court to find bad faith enforcement on the part of the government.[14]

The odyssey ends, as it began, in the Port of Jacksonville.

Affirmed.

---

12. Grigsby v. Coastal Marine Service of Texas, Inc., 5 Cir., 1969, 412 F.2d 1011, 1969 A.M.C. 1513, cert. dism'd, Fidelity and Cas. Co. v. Grigsby, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531; Mississippi Valley Barge Line Co. v. Indian Towing Co., 5 Cir., 1956, 232 F.2d 750, 56 A.M.C. 1761; Legnos v. M/V OLGA JACOB, 5 Cir., 1974, 498 F.2d 666.

13. Not the least problem is the right to limit liability, 46 U.S.C.A. §§ 183–185, 188. The Second Circuit has held in Chinese Maritime Trust, Ltd. v. Republic of Viet Nam, 2 Cir., 1973, 478 F.2d 1357, that there is no right to limit since the owner is in privity by his knowledge that 33 U.S.C.A. § 409 requires removal. Against this holding, a strong argument might be marshalled that limitation protects the owner against *consequences* of a non-privity occurrence, one of which may be statutory obligations. See Olympic Towing Corp. v. Nebel Towing Co., Inc., 5 Cir., 1969, 419 F.2d 230 (en banc, see Brown, Chief Judge, dissenting).

14. See also United States v. Ream, 5 Cir., 1974, 491 F.2d 1243, in which we indicated the strong likelihood that this Circuit would not follow the Seventh in entertaining the selective-prosecution defense. United States v. Falk, 7 Cir., 1973, 479 F.2d 616.