**UNITED STATES of America,
Plaintiff,**

v.

**Carlos RAFAEL, Defendant.**

**No. CIV.A. 03–10230–JGD.**

United States District Court,
D. Massachusetts.

Nov. 19, 2004.

Order Denying Reconsideration
Dec. 20, 2004.

John A. Markey, Moses Smith and Markey LLC, Bedford, MA, for Carlos Raphael.

Peter G. Myer, Torts Branch Civil Division, U.S. Department of Justice, Washington, DC, for USA, Plaintiff.

## MEMORANDUM OF DECISION AND ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

This is an admiralty case in which the plaintiff, United States of America, seeks to recover costs that it incurred in the removal of a sunken fishing boat owned by the defendant, Carlos Rafael ("Rafael"), from the Herman Melville Shipyard in New Bedford, Massachusetts. The Herman Melville Shipyard is part of New Bedford Harbor, which, at all relevant times, was a designated Superfund cleanup site. The matter is before this court on the "United States' Motion for Summary Judgment" (Docket No. 12). By its motion, the United States seeks a judgment in its favor on Count I of its Amended Complaint (Docket No. 2), wherein it contends that Rafael is liable to the United States, pursuant to sections 15 and 19 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 403 and 409, for all costs, damages and disbursements incurred by the government in removing Rafael's sunken boat, plus prejudgment interest.[1] For the reasons detailed below, this court finds that the United States is entitled to the requested relief, and the Motion for Summary Judgment is ALLOWED.

---

1. The remaining counts of the Amended Complaint, which are not the subject of the instant motion, include claims for breach of the general maritime law (Count II), unjust enrichment (Count III), creation of a public nuisance (Count IV), and unauthorized trespass upon the navigable waters and natural resources of the United States (Count V). The court expresses no opinion as to the merits of those claims.

## II. STATEMENT OF FACTS[2]

### Statutory Framework

This case, involving the government's right to recover the costs of removing a sunken vessel owned by Rafael, is governed by the Rivers and Harbors Act of 1899, 30 Stat. 1151 et seq., as amended, 33 U.S.C. §§ 401–416. As detailed further below, 33 U.S.C. § 409 makes it unlawful for a vessel owner to sink or permit the sinking of a vessel in navigable waters, and requires the vessel owner to remove such a wreck immediately. Pursuant to 33 U.S.C. § 414, if the vessel owner fails to act and the vessel has obstructed or endangered navigation for at least 30 days (or fewer if the abandonment of the vessel is legally established in less time), the United States may remove the vessel and then recover its costs from the vessel owner. In the instant case, the undisputed facts establish that Rafael's boat sank, that it remained sunken for more than 30 days, and that the United States removed it. Rafael challenges the government's right to recover the costs of removal on the grounds that the ship was not in navigable waters, it was not obstructing or endangering navigation, the government did not provide Rafael with sufficient notice of its intent to remove the ship, and the costs incurred by the United States were excessive.

While Rafael argues that there are disputed issues of fact, as detailed herein, this court finds that the material facts are not in dispute, and that the United States is entitled to judgment as a matter of law.

### The Cleanup of New Bedford Harbor

In September 1983, the United States Environmental Protection Agency ("EPA") designated the New Bedford Harbor in New Bedford, Massachusetts as a Superfund site pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. §§ 9601 et seq.[3] (See PF at 1). In the mid–1990s, under the authority of CERCLA, the United States began planning for the large-scale environmental cleanup of a section of New Bedford Harbor known as the Herman Melville Shipyard. (See PF at 1). The plans included a strategy to dredge sediment containing dangerously high levels of polychlorinated biphenyls ("PCBs") from the Shipyard floor, permanently isolate the sediments from the public and marine environment, and ultimately achieve the goal of facilitating economic development of the New Bedford Harbor waterfront. (See Pl. Ex. B at 1). While the cleanup project remained in its planning stage, the New Bedford Harbor Development Commission ("HDC") leased waterfront space in the Shipyard to private companies. (See PF at 1–2). One of those companies was Carlos Seafood, a wholesale fishing venture owned by the defendant, Carlos Rafael. (See id. at 2; DF at ¶¶ 2, 4).

In conjunction with his business, Rafael owns, operates and maintains several fishing boats. (See DF at ¶¶ 3, 6). In December 1998, Rafael obtained a license from the HDC that allowed him to store and

---

**2.** A narrative Statement of Facts with citations is included in the Plaintiff's Memorandum (Docket No. 12) and will be cited as "PF" followed by the page number. Attached exhibits will be cited as "Pl.Ex. ___." The defendant included numbered paragraphs of facts in his Memorandum (Docket No. 13) which will be cited as "DF at ¶ ___." Attached exhibits will be cited as "Def. Ex. ___."

**3.** The New Bedford Harbor Superfund site "extends from the shallow northern reaches of the Acushnet River estuary south through the commercial port of New Bedford Harbor and adjacent areas of Buzzards Bay." (Pl.Ex. B at 1).

repair fishing vessels in the Herman Melville Shipyard. (*See* DF at ¶ 5; Def. Ex. 6 at 1). Rafael made lease payments to the HDC for use of a parcel within the Shipyard from December 1998 through at least December 2001. (*See* DF at ¶ 6; Pl.Ex. A at 22 and Ex. 4 to Ex. A).

On January 8, 2001, Rafael purchased the fishing vessel ("F/V") JUST A GIRL. (*See* DF at ¶ 7). Three days later, he towed it from Fairhaven, Massachusetts to the leased parcel at the Herman Melville Shipyard, where it remained docked along the shoreline, in one to four feet of water, awaiting repair. (*See* DF at ¶¶ 7, 8, 13; Pl.Ex. A at 26). Because the F/V JUST A GIRL leaked, Rafael had to pump water out of it every two or three days to keep it afloat. (*See* Pl.Ex. A at 34–35).

In February 2001, a contractor for the United States Army Corps of Engineers commissioned an archaeological survey of sunken boats and other debris at the Shipyard. (*See* PF at 2). The survey identified, inspected for historical value, and catalogued the wrecks of nine wooden fishing boats, six steel vessels and a concrete barge. (*See id.*). At that time, the F/V JUST A GIRL remained afloat in the Harbor. (*See id.*).

### Notices Given to Rafael

On November 6, 2001, EPA sent Rafael a letter notifying him that the agency would need to occupy his leased property **"on or about February 6, 200[2] to re-move abandoned fishing vessels and to dredge PCB-laden sediment from the har-bor floor."** (Def. Ex. 7 at 1).[4] The letter also mentioned EPA's role and responsibilities in the Harbor cleanup project, and explained Rafael's potential right to assis-

tance relocating his business as a "displaced person" under federal law. (*See id.* at 1–2; DF at ¶ 9). One day later, on November 7, 2001, EPA formally requested that Rafael grant the agency access to the leased property in order to conduct environmental remediation activities. (*See* DF at ¶ 10; Def. Ex. 8). Rafael complied with EPA's request. (*See* DF at ¶ 10).

On January 18, 2002, EPA sent Rafael a copy of a letter notifying the Director of the HDC that the government intended to begin mobilizing for the abandoned vessel demolition at the Herman Melville Shipyard on or around February 11, 2002, and that any HDC tenants would have to be vacated by that time. (*See* PF at 3). According to the letter, the project was to involve the demolition and removal of junked vessels from the site. (*See* Pl.Ex. E).

Sometime thereafter, EPA held meetings with Rafael and spoke with him by telephone regarding the agency's plans to proceed with the demolition of abandoned vessels and derelict barges at the Herman Melville Shipyard, and its need for Rafael to remove his business operations from the site. (*See* Pl.Ex. F; Def. Ex. 9 at 1). Subsequently, on March 13, 2002, EPA sent Rafael another letter via certified mail, fax and hand delivery in which it notified him of the agency's intent to initiate an enforcement action against him if he did not remove his operations from the Shipyard immediately because the government's contractors "had mobilized to carry-out the abandoned vessel demolition[.]" (Def.Ex. 9). The letter states, in part:

> While EPA fully anticipates, based on your discussions with the [Army Corps

---

**4.** While the letter states February 6, 2001, the defendant does not raise this as an issue, and clearly understood the date to mean the upcoming February—2002. (*See* DF at ¶ 9—on

November 6, 2001 Rafael was informed he needed to move his equipment and material "in the near future").

of Engineers], that you will be off the site by this weekend, I am still providing you notice that if all your materials, equipment and debris are not removed by the close of business on **March 18, 2002**, under the authority of CERCLA, EPA will initiate an enforcement action either administratively or judicially to compel removal of your operations from the site. This action may include the levying of penalties and the recovery of the Government's cost due to the delay in implementing the clean up action. However, these measures will be unnecessary if all of your material, equipment and debris are removed by March 18th. (*Id.* at 2).

Rafael removed cranes, compressors, welding machines, and one of his fishing boats from the Shipyard. (*See* Pl.Ex. A at 37–38; DF at ¶ 11). Although the precise date when Rafael accomplished these activities is not specified in the record, it is clear that Rafael removed his equipment by the March 18, 2002 deadline. (*See* DF at ¶ 11—Rafael complied with the EPA removal request; DF at ¶ 12—within days of receiving the March 13, 2002 notice, the boatyard was fenced in and Rafael could no longer gain access). Rafael did not, however, remove the F/V JUST A GIRL. (DF at ¶¶ 11–13).[5]

### The Fate of the F/V JUST A GIRL

According to the United States, as of March 18, 2002, the F/V JUST A GIRL had sunk. (PF at 3; Pl.Ex. C at 69–70). It bases this contention on the fact that in or around January 2002, government contractors had identified ten sunken wooden boats, as opposed to the nine which had been identified a year earlier in February 2001. (*See* PF at 3). At that time, however, the government did not know the identity or owner of the tenth sunken ship. (PF at 3).

Rafael contends that the F/V JUST A GIRL was still afloat at the time he removed his other equipment in March 2002. (*See* DF at ¶¶ 11, 14; Def. Ex. 2 at ¶¶ 12–13). Rafael claims that when he removed his other equipment, the F/V JUST A GIRL was in one to four feet of water in the northern end of New Bedford Harbor, beyond the commercial traffic area and over 200 yards outside the navigable channel.[6] (*See* DF at ¶ 14; PF at 3–4). According to Rafael, when he returned to the site within days after removing his equipment, he found that the government had erected fences, locked the gates and posted trespassing signs. (*See* DF at ¶ 12). Consequently, Rafael had no access to the site and, therefore, no means of accessing the F/V JUST A GIRL. (*See id.*). He, therefore, stopped pumping water out of the boat. (DF at ¶ 13). Rafael knew that without pumping every 2–3 days the vessel would sink. (*See* Pl.Ex. A at 40; PF at 3).

It is undisputed that Rafael never notified any state or federal officials that his vessel was sinking or had sunk in the Shipyard. (*See* PF at 3; Pl.Ex. A at 35, 39). It is also undisputed that he never attempted or offered to remove the F/V JUST A GIRL. (Pl.Ex. A at 38–39 and 45–

---

5. While Rafael contends that the F/V JUST A GIRL was not mentioned in the March 13th letter, in fact no items were specifically listed other than "materials, equipment and debris." (DF at ¶ 11; Def. Ex. 9). The letter did expressly state that the EPA was going to remove and demolish abandoned fishing vessels and derelict barges, and dredge the harbor floor. (Def.Ex. 9). It was at least explicit

in the letter, therefore, that EPA needed Rafael to remove all of his possessions, including the F/V JUST A GIRL.

6. While the location of where the ship sank is not in dispute, Rafael contends that it was not in navigable waters and did not obstruct or endanger navigation.

46). Finally, Rafael does not dispute that the vessel was sunk for more than 30 days before the United States removed it.[7] Consequently, the precise date the boat sank is not a material fact in the instant case.

It was not until about April 12, 2002, that the EPA learned, by happenstance, that the sunken F/V JUST A GIRL belonged to Rafael. (*See* DF at ¶ 16; PF at 4). The government neither specifically notified Rafael that it considered the boat abandoned and subject to demolition nor communicated with him about the possibility of raising and removing the boat himself. (*See* DF at ¶¶ 18–19). Instead, the EPA decided to continue with the cleanup and its subcontractor demolished and removed the F/V JUST A GIRL, between April 26, 2002 and May 2, 2002, as part of the overall effort to clear all abandoned vessels and other debris from the Herman Melville Shipyard. (*See* PF at 4; DF at ¶ 17).

Overall, the government incurred $1,361,298.86 in costs to complete the abandoned vessel demolition phase of its cleanup project. (*See* PF at 1, 4–5; Pl.Ex. G). This figure included charges for mobilization, clearing and grading, construction of an entrance road, clearing of a staging area, installation of an oil boom and turbidity curtain, in-water debris management, transportation and disposal of fuel remaining in the wrecks, materials handling on site, disposal of water runoff on-site, sampling and analysis of the sediments and wood debris, transportation and disposal of the wood debris at an appropriate off-site facility, project management and oversight, and demobilization. (*See* PF at 4).

The United States attributes $50,500 of its costs to the removal, testing and disposal of the F/V JUST A GIRL. (*See* PF at 4–5; Pl.Ex. G). Rafael does not dispute the fact that the government incurred these costs or the government's method of allocating these costs. Rather, Rafael asserts that he had the equipment and the ability to remove the boat himself, and that he could have raised and relocated the vessel, within forty-eight hours of receiving notice, for about $500, based on the fact that he "had raised other boats in much worse condition and in much deeper water." (*See* DF at ¶ 19). However, Rafael does not address the fact that the ship was contaminated with PCBs and needed to be disposed of accordingly.

Additional facts will be provided below where appropriate.

## III. DISCUSSION

### A. Standard of Review—Summary Judgment

Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] ... may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A material fact is one that affects the outcome of the suit. *See id.* at 248, 106 S.Ct. at 2510.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex*

---

7. As detailed *infra*, the F/V JUST A GIRL was removed sometime between April 26 and May 2, 2002. (PF at 4). Because the record establishes that Rafael removed his other equipment by March 18, 2002, and stopped pumping the F/V JUST A GIRL by that date, and that without pumping every 2–3 days the boat would sink, it appears that the vessel sank more than 30 days before its removal. Rafael does not claim otherwise.

*Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at 2553.

In ruling on a motion for summary judgment, the court construes the evidence in the light most favorable to the non-movant, resolving all inferences in its favor, and determines whether the moving party is entitled to judgment as a matter of law. *See Saenger Org. v. Nationwide Ins. Licensing Assocs.,* 119 F.3d 55, 57 (1st Cir. 1997).

Applying these principles to the instant case, this court concludes that the United States is entitled to summary judgment because the undisputed facts establish that Rafael is strictly liable, pursuant to sections 15 and 19 of the Rivers and Harbors Act of 1899, 33 U.S.C. §§ 409 and 414, respectively, for the costs incurred by the government in the removal and disposal of the F/V JUST A GIRL.

### B. *Liability Under the Act*

■ "The Rivers and Harbors Act of 1899, an assertion of the sovereign power of the United States, was obviously intended to prevent obstructions in the Nation's waterways." *Wyandotte Transp. Co. v. United States,* 389 U.S. 191, 201, 88 S.Ct. 379, 385, 19 L.Ed.2d 407 (1967) (internal citation omitted). *See also United States v. Baycon Indus., Inc.,* 804 F.2d 630, 634 (11th Cir.1986) (The Act "was enacted to protect the nations [sic] navigable waterways from obstructions."). To that end, Section 15 of the Act provides, in relevant part:

It shall not be lawful ... to sink, or permit or cause to be sunk, vessels or other craft in navigable channels .... And whenever a vessel, raft or other craft is wrecked and sunk in a navigable channel ... it shall be the duty of the owner, lessee, or operator of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411 to 416, 418, and 502 of this title.

33 U.S.C. § 409.[8] Accordingly, "Section 409 makes it unlawful for a vessel owner to sink or cause any vessel to be sunk in a navigable channel," and requires the vessel owner "to immediately remove such a wreck." *In re Barnacle Marine Mgmt. Inc.,* 233 F.3d 865, 868 (5th Cir.2000).

If a vessel owner "fails to act to remove the obstruction, the government may undertake the task in the interest of navigational safety, and the owner will be held liable ... for this cost ...." *Tennessee Valley Sand & Gravel Co. v. M/V Delta,* 598 F.2d 930, 934 (5th Cir.), *reh'g denied and op. amended by* 604 F.2d 13 (5th Cir.1979). *See also Wyandotte Transp. Co.,* 389 U.S. at 204–05, 88 S.Ct. at 387. The government's removal authority is specifically set forth in Section 19 of the Act, which states in relevant part:

(a) Whenever the navigation of any river, lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a

8. "In 1986 ... Congress changed § 409's standard for liability from negligence to strict liability." *In re Barnacle Marine Mgmt. Inc.,* 233 F.3d 865, 868 n. 6 (5th Cir.2000). Be-

cause much of the case law interpreting and applying the Act predates the 1986 amendment, courts commonly discuss liability under the Act using the negligence standard.

longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the sunken vessel, boat, water craft, raft, or other obstruction shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of the Army at his discretion, without liability for any damage to the owners of the same: *Provided,* That in his discretion, the Secretary of the Army may cause reasonable notice of such obstruction of not less than thirty days ... to be given by publication, addressed "To whom it may concern," in a newspaper published nearest to the locality of the obstruction, requiring the removal thereof ...

(b) The owner, lessee, or operator of such vessel, boat, watercraft, raft, or other obstruction as described in this section shall be liable to the United States for the cost of removal or destruction and disposal

. . . . .

33 U.S.C. § 414.[9]

Rafael contends that summary judgment is inappropriate in this case because there are disputed facts as to whether the vessel sank in "navigable" waters or whether the boat "obstructed or endangered navigation." He also contends that the government abused its discretion by failing to provide him sufficient notice and an opportunity to remove his boat. Finally, Rafael claims that there are disputed material facts as to the amount of damages to which the government is entitled. Each of these claims will be discussed below.

## C. The Undisputed Facts Establish the Vessel Sank in Navigable Waters and Obstructed or Endangered Navigation

In support of his claim that there are disputed facts as to whether the F/V JUST A GIRL was in navigable waters or impeded navigation when it sank, Rafael relies on the Affidavit of David Dubois, President of Marine Safety Consultants, Inc. and an experienced "private sector marine surveyor and consultant[.]" (Def. Ex. 1 at ¶ 1). In his five paragraph affidavit, Mr. DuBois opined that, based on the government's drawings depicting the location of the sunken vessel and other navigation charts, the F/V JUST A GIRL "was located in 1' to 4' of [sic] in the northern end of New Bedford Harbor, beyond the commercial traffic area and more than two hundred (200) yards outside of the navigable channel." (*Id.* at ¶¶ 3–4). He further opined as follows:

> Based upon my own experience in the field and based upon my review of the aforementioned documents, I have also concluded that the F/V JUST A GIRL did not impede, obstruct, or endanger navigation in the Acushnet River.

(*Id.* at ¶ 5). As is obvious, the facts as to where the vessel sank are not in dispute— Rafael is relying on the government's drawings. The fact that Mr. DuBois has asserted a conclusory, unsubstantiated opinion as to the vessel's lack of interference with navigation does not create a factual dispute precluding summary judg-

---

**9.** While in Count I of its Amended Complaint, the United States asserts that Rafael is liable to it under sections 9 and 15 of the Rivers and Harbors Act, 33 U.S.C. §§ 403 and 409, Rafael does not dispute that the United States may proceed under Section 19 of the Act (33 U.S.C. § 414) as well. That section is expressly incorporated into 33 U.S.C. § 409, which provides that the failure of an owner of a sunken craft to immediately remove the craft from a navigable channel "shall be considered as an abandonment of such craft, and subject ... to removal by the United States as provided for in sections 411 to 416 ...." 33 U.S.C. § 409.

ment. *See Sheinkopf v. Stone,* 927 F.2d 1259, 1262 (1st Cir.1991) (in connection with motions for summary judgment, court need not "give credence to 'mere allegations'" or accept "conclusory assertions"). More significantly, Mr. DuBois' opinion does not address the appropriate legal standards.

### 1. *"Navigable" Waters*

■ "The term 'navigable channel' in § 409 is not limited to the dredged, buoy marked channels to which commercial vessels are confined." *Chute v. United States,* 610 F.2d 7, 11 n. 5 (1st Cir.1979), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2155, 64 L.Ed.2d 789 (1980) (wreck sunk on shoals "outside normal shipping channels" with parts of it being "so shallow as virtually to preclude navigation" is in "navigable" water as the area is "frequented by small, pleasure-fishing craft"). *See also Red Star Towing & Transp. Co. v. Woodburn,* 18 F.2d 77, 78 (2d Cir.1927) ("navigable channel" not confined "to those deeper channels marked by buoys and used by large vessels"). Rather, the test of navigability is whether the waters are "of sufficient capacity to be capable of being used for useful purposes of navigation; that is, for trade and travel in the usual and ordinary modes." *Nat'l Forwarding Co. v. Payne,* 297 F. 663, 666 (S.D.N.Y.1923). *See also United States v. Raven,* 500 F.2d 728, 732 (5th Cir.1974) (government need only prove that vessel is stranded in waters "capable of sustaining the traffic of other vessels"). Applying this standard, courts interpreting the Act

have determined that vessels in "navigable waters" include one sunk between piers, *see Nat'l Forwarding Co.,* 297 F. at 665, and "a sunken vessel either in or near waters that are open for the use of others." *Raven,* 500 F.2d at 731. "Evidence of extensive and continued use is not necessarily controlling, susceptibility of use for transportation and commerce being the true criterion of navigability." *United States v. Cavalliotis,* 105 F.Supp. 742, 744 (E.D.N.Y.1952).

■ Rafael, and his expert, have failed to apply the appropriate standard. Although the F/V JUST A GIRL sank in shallow water and was 200 yards away from the main channel, the fact that it and the vessel that towed it from Fairhaven to New Bedford were capable of reaching the location where it sank, and where Rafael carried out a commercial enterprise, demonstrates that the leased parcel was "susceptible of use for transportation and commerce." *Id.*[10] Moreover, the parcel where Rafael stored the F/V JUST A GIRL was part of New Bedford Harbor, a commercial port that, together with adjoining waters, constitutes a "highway over which commerce is or may be carried on ..." and, therefore, navigable water. *Id. See also Raven,* 500 F.2d at 732 (ship grounded toward shore was in navigable water, as evidenced by fact that the ship "could get as far as to be stranded ...."). Accordingly, this court finds that the undisputed facts establish that the waters in which the F/V JUST A GIRL was docked and where the boat ultimately sank constituted a

---

**10.** The defendant cites *Cavalliotis* to support his assertion that the issue of navigability is a question of fact. That is not what *Cavalliotis* says. Specifically, the decision reads: "[t]he judicial standards to be applied in determining whether a particular waterway is navigable within the meaning of the statute, 'involve questions of law inseparable from the particular facts to which they are applied.'" *Caval-* *liotis,* 105 F.Supp. at 744 (quoting *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 404, 61 S.Ct. 291, 298, 85 L.Ed. 243). Where, as here, there are no disputed facts relating to the location of the sunken vessel or the use of the relevant waterway, a determination of navigability as a matter of law is appropriate.

"navigable channel" and was part of the "navigable waters of the United States" under the Act.

### 2. *Obstruction to Navigation*

 This court also finds that the record supports the government's determination that the F/V JUST A GIRL posed an obstruction to navigation and had to be removed. "Under 33 U.S.C. section 414, when the Secretary of the Army (through its agency, the Army Corps of Engineers), in the exercise of sound discretion, determines that navigable waters of the United States are obstructed or endangered by any wreck, it may remove the wreck without liability for any damage to the owner thereof." *Wolder v. United States,* 613 F.Supp. 1139, 1150 (D.Haw.1985), *aff'd on other grounds,* 807 F.2d 1506 (9th Cir. 1987). Consequently, "[t]he determination of whether a wreck poses an obstacle and must therefore be raised rests initially with the Corps, and that determination will be overturned by a reviewing court only if it is arbitrary and capricious." *Agri–Trans Corp. v. Gladders Barge Line, Inc.,* 721 F.2d 1005, 1010 (5th Cir.1983). "[I]t is not necessary that the wreck be a present, actual obstruction to navigation before action can be taken by the Corps under section 414." *Wolder,* 613 F.Supp. at 1150. Pursuant to section 414, the Corps may act if a sunken vessel "endangers, i.e., poses a potential hazard to navigation under conditions which may be reasonably anticipated to occur . . . ." *Id.*

Again, the conclusory affidavit of Mr. DuBois does not address the appropriate standard and does not raise a disputed issue of material fact. The undisputed record before this court shows that the F/V JUST A GIRL sank in a federal Superfund site, and that the government's ultimate goal in cleaning up the site was the restoration of New Bedford Harbor, including its waterfront, to its natural condition for use in maritime commerce. One of the government's first steps in implementing its cleanup plan was to remove and demolish abandoned vessels, so that it would be able to dredge the PCB-laden harbor floor. As long as the F/V JUST A GIRL remained sunk in the Herman Melville Shipyard, it posed an obstacle to the cleanup vessels and equipment, as well as an obstacle to the ultimate restoration and use of the Harbor for navigation and commerce. Therefore, the United States' determination that the F/V JUST A GIRL posed an obstacle to navigation was not arbitrary and capricious.

### D. *The Government's Notice Was Adequate*

 Rafael contends that the government abused its discretion in failing to advise him specifically to remove the F/V JUST A GIRL and that, absent specific notice to remove the vessel, the government's damages should be limited as a matter of policy to the salvage value of the vessel. These arguments find no support in the applicable law or undisputed facts of this case.

33 U.S.C. § 404 provides that "in his discretion" the Secretary of the Army may give notice requiring the removal of an obstruction. In the instant case, the undisputed facts establish that the government's failure to provide Rafael with specific notice that it considered his vessel the F/V JUST A GIRL abandoned and intended to remove it was not an abuse of discretion.

In the first place, the "statute makes the giving of notice to the owner to remove the obstruction a purely discretionary matter with the Secretary of the Army. It is difficult to see, therefore, how removal without notice could be arbitrary or unreasonable." *Zubik v. United States,* 190 F.2d 278, 281

(3d Cir.1951). Moreover, in this case the government repeatedly warned Rafael, both orally and in writing, that it intended to begin remediation activities at the Herman Melville Shipyard, that it needed him to vacate the premises, and that he needed to remove all of his operations and equipment. Thus, Rafael knew beginning in November 2001 that the Harbor needed to be vacated by February 2002 to enable the government "to dredge PCB-laden sediment from the harbor floor." (Def. Ex. 7 at 1). The agency also notified him, in a copy of a letter to the HDC dated January 18, 2002, of its intention to begin demolition and removal of junked vessels from the site on or about February 11, 2002. (*See* PF at 3). In addition, government officials held meetings with Rafael and spoke to him over the telephone regarding their plans to remove abandoned vessels from the Shipyard and their need for him to remove all of his equipment. (*See* Pl. Ex. F; Def. Ex. 9 at 1). Finally, in a letter dated March 13, 2002, EPA threatened to take enforcement action against Rafael if he failed to remove, by March 18, 2002, all of his "materials, equipment and debris . . ." from the site. (Def.Ex. 9). Although none of these notices identified the specific items to be removed, Rafael apparently removed all things of value to him, but left the F/V JUST A GIRL.

Rafael has proffered no reason as to why he did not remove the vessel. He has, however, admitted that within a few days of his receipt of the March 13th letter, he knew the vessel was in the cordoned-off cleanup site, he knew that it could not be pumped, and he knew it would sink. The government did not begin its removal of the F/V JUST A GIRL until April 26, 2002. Nevertheless, at no time did Rafael notify anyone that the boat was going to or had sunk. Nor did he suggest the possibility of raising the ship himself. Under these circumstances, the undisputed facts establish that the government did not abuse its discretion as a matter of law in connection with the notices given to Rafael. Nor does the court find any policy reason to limit the government's recovery.

### E. *There Are No Disputed Facts About the Amount of Damages*

Rafael contends that there are disputed facts about whether the amount charged by the government is reasonable, thereby precluding the entry of summary judgment. This court disagrees.

▮ Pursuant to 33 U.S.C. § 414, the owner of a sunken boat that has obstructed or endangered the navigation of the navigable waters of the United States "shall be liable to the United States for the cost of removal or destruction and disposal . . . ." 33 U.S.C. § 414. *See also Wyandotte Transp. Co.*, 389 U.S. at 204–05, 88 S.Ct. at 387 (Rivers and Harbors Act authorizes the government to recover its removal costs). Rafael does not dispute that the United States incurred $1,361,298.86 for the cost of removing, testing and disposing of abandoned vessels from the site. Nor does he challenge the government's calculations allocating the costs among different vessels, and concluding that the amount attributable to the removal and disposal of the F/V JUST A GIRL is $50,500 excluding interest and costs. Furthermore, Rafael does not challenge any particular costs on the grounds that they are improperly included as costs of removal, are unreasonably calculated or are otherwise improper. *See United States v. Ohio Barge Lines, Inc.*, 796 F.2d 685 (3d Cir.1986) (examining whether a particular cost incurred in removing sunken vessels was a "removal" expense); *Ingram Corp. v. Ohio River Co.*, 505 F.2d 1364, 1373 (6th Cir.1974) (damages should be reasonably

calculated based on the circumstances of the case). Instead, Rafael argues simply that it is unreasonable to charge him $50,500, and that he could have raised and relocated the boat himself for about $500.

The court finds that Rafael has not raised a genuine dispute as to whether or not the calculation of damages is reasonable. Rafael's argument that he could have removed the boat for $500 ignores the fact that the vessel was located in a federal Superfund site and that once it sank into PCB-contaminated sediments, it had to be removed and disposed of appropriately. Accordingly, Rafael has failed to "adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material'" with respect to the government's recoverable removal costs. *Sheinkopf*, 927 F.2d at 1261 (citation omitted).

### 1. *Prejudgment Interest*

 The government has requested prejudgment interest.[11] "Prejudgment interest on admiralty claims is generally allowed on claims for prejudgment economic harm as compensation for the use of funds to which the plaintiff was ultimately judged entitled, but which the defendant had the use of prior to judgment." *Borges v. Our Lady of the Sea Corp.*, 935 F.2d 436, 444 (1st Cir.1991) (internal quotation and citation omitted). Where, as here, a federal statute is silent on the rate of interest to be applied, a court "has broad discretion in choosing a rate." *Cottrill v. Sparrow, Johnson & Ursillo, Inc.*, 100 F.3d 220, 225 (1st Cir.1996), and cases cited.

 In federal court, the post-judgment interest rate is the weekly average one year constant maturity Treasury yield as published by the Board of Governors of the Federal Reserve System. *See* 28 U.S.C. § 1961. This is the rate that this court believes should be applied to the prejudgment interest award as well. *See City of Boston v. S.S. Texaco Texas*, 773 F.2d 1396, 1401 (1st Cir.1985) (in action by City to recover damages arising from collision of tanker with city bridge, the "City is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk free obligations"). *See also Cottrill*, 100 F.3d at 225 ("the federal rate is an objective measure of the value of money over time"). In view of the fact that the amount due from Rafael could not be calculated until the work was complete, and the record is silent as to when demand for payment was first made, prejudgment interest shall commence on January 27, 2003, the date suit was filed. *See SS Texaco Texas*, 773 F.2d at 1401 (discussing several alternatives as to when prejudgment interest is to commence); *United States v. M/V Zoe Colocotroni*, 602 F.2d 12, 14 (1st Cir.1979) (no abuse of discretion in allowing prejudgment interest from the date the government first presented a bill to defendants for costs incurred in cleaning up oil spill in United States waters since before then claims were "unliquidated and unascertained") (internal citation omitted).

### IV. CONCLUSION

"The Federal Government is charged with ensuring that navigable waterways, like any other routes of commerce over

---

11. The United States has requested an award of prejudgment interest in accordance with 31 U.S.C. § 3717, which applies to interest on administrative claims and also provides for charges and penalties. *See* 31 U.S.C. § 3717.

However, the United States has provided no case law supporting the application of this statute to its present claims, or justifying an award of charges and penalties on its claims.

which it has assumed control, remain free of obstruction." *Wyandotte Transp. Co.,* 389 U.S. at 201, 88 S.Ct. at 385. The undisputed, material facts of this case demonstrate that the United States, acting pursuant to its authority under the Rivers and Harbors Act, properly removed the F/V JUST A GIRL from the Herman Melville Shipyard. Accordingly, for the reasons stated herein, the "United States' Motion for Summary Judgment" (Docket No. 12) is ALLOWED. It is further ORDERED that the United States is entitled to recover damages in the amount of $50,500, as well as prejudgment interest from the date suit was filed at the federal rate of interest.

### MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION FOR RECONSIDERATION AND/OR TO ALTER OR AMEND JUDGMENT

On November 19, 2004, this court issued a "Memorandum of Decision and Order on Plaintiff's Motion for Summary Judgment" ("Summary Judgment Order") (Docket No. 16) in which it granted the United States of America's motion for summary judgment on its claims pursuant to the Rivers and Harbors Act of 1899, and awarded the plaintiff $50,500 in damages, as well as prejudgment interest. Currently before the court is the "Motion for Reconsideration and/or Motion to Alter or Amend Judgment Filed on Behalf of Defendant Carlos Rafael" (Docket No. 17). By his motion, defendant Carlos Rafael requests that the court amend its Summary Judgment Order, pursuant to Fed. R.Civ.P. 59(e), either by reducing the damage award to $11,290 or by retracting its decision on damages and scheduling a hearing to resolve allegedly disputed issues of material fact regarding plaintiff's damages. For the reasons that follow, the defendant's motion is DENIED.

### BACKGROUND

In the Summary Judgment Order, this court awarded $50,500 in damages to the United States pursuant to the Rivers and Harbors Act of 1899, 30 Stat. 1151 *et seq.,* as amended, 33 U.S.C. §§ 401–416. The Rivers and Harbors Act makes it unlawful for a vessel owner to sink or permit the sinking of a vessel in navigable waters, and requires the vessel owner to remove such a wreck immediately. *See* 33 U.S.C. § 409. If the vessel owner fails to act, and the vessel has obstructed or endangered navigation for at least 30 days (or fewer if the abandonment of the vessel is legally established sooner), the Act authorizes the United States to remove the vessel and recover its costs from the vessel owner. *See* 33 U.S.C. § 414. For purposes of his present motion, Rafael does not challenge this court's finding that the undisputed, material facts of this case demonstrate that the United States, acting pursuant to its authority under the Rivers and Harbors Act, properly removed Rafael's sunken boat, the F/V JUST A GIRL, from the Herman Melville Shipyard in New Bedford, Massachusetts. Nor does Rafael challenge the government's right to recover the costs of removing the F/V JUST A GIRL. Instead, Rafael challenges the amount of the damages and the government's method of calculating these damages.

The removal costs in the instant case were caused by the environmental conditions at the Shipyard at the time of the removal of Rafael's boat. It is undisputed that the Herman Melville Shipyard is part of New Bedford Harbor, which at all times relevant to this case, was a designated Superfund cleanup site contaminated with dangerously high levels of polychlorinated biphenyls ("PCBs"). *See* Summary Judgment Order at 3. It is further undisputed that the government's cleanup plan includ-

ed a strategy to dredge PCB-laden sediment from the Shipyard floor, permanently isolate the sediments from the public and marine environment, and ultimately restore the Harbor for economic development. *See id.* at 3–4. One of the first steps the United States had to take in order to implement its cleanup plan was to remove and demolish abandoned vessels and other debris from the Shipyard. *See id.* at 9. There is no dispute that the government removed the F/V JUST A GIRL as part of the abandoned vessel demolition phase of the New Bedford Harbor cleanup project, and that the government incurred $1,361,298.86 for the cost of removing, testing and disposing of abandoned vessels from the site.[12] *See id.* at 9. The $50,500 damage award represents the portion of these costs that the United States allocated to the removal and disposal of the F/V JUST A GIRL.

Although he did not raise the issue previously, Rafael now argues that the government's damages witness, Christopher Turek, testified that the only costs that he could definitely attribute to the removal of the F/V JUST A GIRL were $10,400 for

the actual removal and $890 for disposing of oil from the boat. Rafael further contends, based on Turek's testimony, that the United States incurred its remaining costs as part of its overall cleanup effort, and that the government admittedly would have incurred those costs even if the F/V JUST A GIRL had not been present in the Shipyard.[13] According to Rafael, Mr. Turek's admissions raise genuine issues of material fact regarding the actual costs of removing the F/V JUST A GIRL and the fairness and accuracy of the government's method for calculating its damages. For the reasons detailed below, this court finds that the record does not support the defendant's position.

## DISCUSSION

"Under Fed.R.Civ.P. 59(e), a court may alter or amend a judgment based on a 'manifest error of law or fact' or newly discovered evidence." *Zukowski v. St. Lukes Home Care Program,* 326 F.3d 278, 282 n. 3 (1st Cir.2003) (quoting *Aybar v. Crispin–Reyes,* 118 F.3d 10, 16 (1st Cir.1997)(internal quotation and citation omitted)). However, "the rule does not

---

12. The $1,361,298.86 that the government incurred to complete the abandoned vessel demolition project at the Herman Melville Shipyard included charges for mobilization, clearing and grading, construction of an entrance road, clearing of a staging area, installation of an oil boom and turbidity curtain, in-water debris management, transportation and disposal of fuel remaining in abandoned vessels, materials handling on site, disposal of water runoff on site, sampling and analysis of sediments and wood debris, transportation and disposal of the wood debris at an appropriate off-site facility, project management and oversight, and demobilization. Summary Judgment Order at 9.

13. In his deposition, Turek agreed that the government would have incurred the following costs even if the F/V JUST A GIRL had not been present in the Herman Melville Shipyard: (a) costs relating to soil sampling

and work plans; (b) pre-planning charges, costs incurred to measure PCBs, and management fees to Foster Wheeler Environmental Corporation; (c) costs associated with a safety and health plan, various submittals and a cost estimate; (d) costs of mobilization, creation of a sorting and staging area, construction of an entrance and road, debris clearing and grading; (e) costs for installation of an oil boom and turbidity curtain, and for in-water management of debris and spills; (f) costs incurred to dispose of water runoff from the sorting area and demobilization costs, and (g) salaries of government employees as well as those employed by the government's oversight contractor. *See* Turek Dep. attached to the "Motion for Reconsideration and/or Motion to Alter or Amend Judgment Filed on Behalf of Defendant Carlos Rafael" ("Def.Mem.") (Docket No. 17) at pp. 19–20, 38, 41–42, 44–46, 52–55.

allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to judgment." *Id.* (quotations and citation omitted).

In this case, the evidence that Rafael presents to support his present motion was neither new nor unavailable at the time this court entered its Summary Judgment Order. Not only was Turek's deposition testimony available throughout the summary judgment process, but both parties also relied on and attached relevant portions of Turek's testimony to support their summary judgment arguments. Because Rafael could have and should have presented his current arguments to this court prior to judgment, his failure to do so is fatal to his present motion. On this basis alone, it is appropriate to deny Rafael's motion.

█ Even addressing the substance of Rafael's arguments, this court finds that Rafael has failed to raise a genuine dispute as to whether or not the calculation of damages is reasonable. In support of its motion for summary judgment, the government submitted cost documentation as well as excerpts from the deposition of Christopher Turek, who testified pursuant to Fed.R.Civ.P. 30(b)(6) regarding the government's method of allocating removal costs to the F/V JUST A GIRL. Turek provided a detailed explanation as to how the government calculated $50,500 in removal costs for Rafael's vessel. *See* "United States' Motion for Summary Judgment" (Docket No. 12), Ex. C. In particular, he demonstrated how the government prorated its overall costs, taking into account the specific work performed by the contractors and subcontractors involved, the direct and indirect costs of the project, and the number and types of vessels that had to be removed from the Shipyard. *See id.* Turek also used documentary evidence to

explain how the government arrived at each of the cost figures pertaining to Rafael's vessel. *See id.* at Exs. C and G.

In opposing the summary judgment motion, Rafael failed to raise a genuine dispute regarding the reasonableness of the plaintiff's cost calculations. He argued simply that it was unreasonable to charge him $50,500, and that he could have raised and relocated the boat himself for about $500. Rafael's argument ignored the fact that the vessel was located in a federal Superfund site and that it had to be removed appropriately. Additionally, Rafael's argument did not raise an issue regarding the appropriateness of the government's method of allocating costs among the vessels located in the Shipyard. Nor did it raise a dispute as to any of the specific costs on the grounds that they were improperly included as costs of removal, were unreasonably calculated or were otherwise improper. *See United States v. Ohio Barge Lines, Inc.,* 796 F.2d 685 (3d Cir.1986) (examining whether a particular cost incurred in removing sunken vessels was a "removal" expense); *Ingram Corp. v. Ohio River Co.,* 505 F.2d 1364, 1373 (6th Cir.1974) (damages should be reasonably calculated based on the circumstances of the case). Accordingly, this court concluded that Rafael had failed to "adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material'" with respect to the government's recoverable removal costs. *Sheinkopf v. Stone,* 927 F.2d 1259, 1261 (1st Cir.1991) (citation omitted).

In his present motion, Rafael contends that there is a genuine factual dispute regarding the reasonableness of the plaintiff's removal costs because, as Turek testified, the United States admittedly would have incurred the costs relating to its overall cleanup effort even if the F/V JUST A GIRL had not been present in the Ship-

yard. Again, Rafael's argument fails to acknowledge the fact that once his vessel sank into a contaminated federal Superfund site, it had to be removed, along with the other abandoned vessels, as part of a larger cleanup plan. Rafael has not raised a genuine issue of material fact regarding the method that the government used to prorate damages or the fairness and accuracy of the government's calculations. Although Rafael states that he questions the underlying facts and accounting assumptions on which the United States relied, he has not presented specific facts demonstrating why the United States' calculations are improper or unreasonable. *See id.*, 927 F.2d at 1262 (in connection with motions for summary judgment, the court need not "give credence to 'mere allegations'" or accept "conclusory assertions"). Consequently, this court finds that it was reasonable for the United States to prorate its overall costs among the sunken vessels and to seek reimbursement from Rafael for both the direct costs it incurred to remove the F/V JUST A GIRL, and the prorated amount of the project costs. Therefore, Rafael's motion for reconsideration is denied on the merits.

### CONCLUSION

This court finds that Rafael has failed to introduce any new evidence or advance any arguments that he could not have presented prior to this court's summary judgment decision. Under Fed.R.Civ.P. 59(e), therefore, the "Motion for Reconsideration and/or Motion to Alter or Amend Judgment Filed on Behalf of Defendant Carlos Rafael" (Docket No. 17) is DENIED. Even after evaluating Rafael's motion on the merits, this court determines that Rafael has failed to raise a genuine issue of material fact that would support a reduction in the amount of damages awarded to the United States or require a hearing to consider damages.